**DOCKETED**

SEP 2 9 2003

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| ALLEN EHRLICH, individually and On Behalf Of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | **03C 6821** |
| v. | ) ) | No. |
| MIDWAY GAMES, INC., NEIL D. NICASTRO, THOMAS E. POWELL, and KENNETH J. FEDESNA, | ) ) ) ) | JUDGE JOAN H. LEFKOW |
| | ) ) | MAGISTRATE JUDGE GERALDINE SOAT BROWN |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT FOR
### VIOLATION OF FEDERAL SECURITIES LAWS

Plaintiff, Allen Ehrlich, ("Plaintiff") individually and on behalf of all other persons similarly

situated, by his undersigned attorneys, for his complaint against defendants, alleges the following

based upon personal knowledge as to himself and his own acts, and information and belief as to all

other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which

included, among other things, a review of the defendants' public documents, conference calls and

announcements made by defendants, United States Securities and Exchange Commission ("SEC")

filings, wire and press releases published by and regarding Midway Games, Inc. ("Midway" or the

"Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

discovery.

### NATURE OF THE ACTION

1.     This is a federal securities class action brought by the Plaintiff on behalf of himself

and a Class consisting of all other persons who purchased the publicly traded securities of Midway

Games, Inc. (NYSE: MWY), between December 11, 2001 and July 30, 2003, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     The interactive entertainment sector is highly competitive and characterized by the continuous introduction of new titles and the development of new technologies. A developer's ability to compete successfully is based in large part on the company's ability to (1) select and develop popular titles, (2) identify and obtain rights to commercially marketable intellectual properties, and (3) adapt products for use with new technologies.

3.     Industry analysts report that development costs and cycle length in the interactive entertainment sector have increased significantly between 2001 and 2002, making it paramount for publishers to closely manage the development process. To cope with these issues,

> Most major publishers have initiated "Greenlight" processes that enable senior management to monitor on-going costs, progression of creative design and overall gameplay for individual titles on a regular basis. **With most publishers having more than 100 titles in active development, this can be a daunting task but is one which [Thomas Weisel Partners] believe is essential to a sector that is becoming more fiscally responsible.**

Thomas Weisel Partners, <u>Entertainment Software: A White Paper on the Interactive Game Publishing Industry</u> (2002)(emphasis added)(hereinafter referred to as the "White Paper").

4.     Moreover, unit sales for new titles are heavily skewed toward the first few weeks following the product's release. The White Paper emphasized:

> **Unit sales for titles are front-end loaded, with over 50% of sales recorded in the first 2 weeks.** Particularly in case of franchise titles, gamers know when new titles are scheduled to be released . . . This reinforces our belief that investors should evaluate the pipeline of

> game publishers and watch for initial data on new releases,
> particularly when a title is a publisher's marquee title.

Id. (emphasis added).

5.     The combination of increased development costs and longer product cycle length with front-loaded sales profits has created a strong correlation between the release of a marquee title and an interactive entertainment company's earnings per period. Thus, the timely release of new titles is crucial to the Company's ability to meet its earnings expectations for any given period.

6.     Throughout the Class Period, Midway materially misrepresented the release dates of critical products, which in turn led to the Company's inability to meet its earnings expectations. As discussed in detail below, Midway failed to disclose and/or misrepresented the operating problems within its studios regarding the development and release of its products and failed to disclose the fact that it was currently experiencing decreased demand for its products, resulting in the Company's inability to meet revenue and earnings guidance provided by defendants for fiscal 2002 and beyond.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

9.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in

substantial part in this District. Additionally, the Company maintains its principal executive offices in this Judicial District.

10. In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

*Plaintiff*

11. Allen Ehrlich, purchased Midway securities, as set forth in the accompanying certification attached hereto and incorporated herein by reference, and has suffered damages as a result of the wrongful acts of defendants as alleged herein.

*Defendants*

12. Midway is a corporation organized and existing under the laws of Delaware with its principal place of business located within this judicial district at 2704 West Roscoe Street, Chicago, Illinois 60618.

13. Neil D. Nicastro ("Nicastro") was, at all relevant times during the Class Period, the Company's President, Chief Executive Officer, and Chief Operating Officer.

14. Thomas E. Powell ("Powell") was, at all relevant times during the Class Period, the Company's Executive Vice President, Chief Financial Officer and Treasurer.

15. Kenneth J. Fedesna ("Fedesna") was, at all relevant times during the Class Period, the Company's Executive Vice President of Product Development and Director.

-4-

16.     Nicastro, Powell and Fedsna are collectively referred to hereafter as the "Individual Defendants." During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Midway, was privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17.     Each of the Individual Defendants is liable as a direct participant with respect to a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Midway publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Midway's business, operations, management, and the intrinsic value of Midway publicly traded securities and caused Plaintiff and other members of the Class to purchase Midway securities at artificially inflated prices.

18.     In addition, the Individual Defendants, by reason of their status as senior executive officers and directors were each a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their position of control, the Individual Defendants were able to and did, directly or indirectly, control the content of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.

19.     The Individual Defendants, because of their positions with Midway were provided with copies of Midway's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had both the ability and opportunity to prevent their issuance or cause them to be corrected. The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

20.     The Individual Defendants are liable, jointly and severally, as direct participants in and co-conspirators of, the wrongs complained of herein.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a federal class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all those who purchased the securities of Midway between December 11, 2001 and July 30, 2003, inclusive, (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

22.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Midway securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

23.     Plaintiff's claims are typical of the claims of the members of the Class, because plaintiffs and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

24.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation.

25.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

26.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

>   (a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
>   (b)     Whether the Company's publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;
>
>   (c)     Whether defendants breached any duty to convey material facts or to correct material acts previously disseminated;

(d)     Whether the defendants acted willfully, with knowledge or recklessly, in

omitting and/or misrepresenting material facts; and

(e)     Whether the members of the Class have sustained damages and, if so, what is

the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### Background

27.     Midway is a leading developer and publisher of interactive entertainment software.

Midway and its predecessors have been in the business of creating videogames for more than 20

years and have published more than 400 titles in that time.  Midway has published videogames for

every major platform, including Sony's Playstation, Nintendo 64, Super NES, Game Boy, Game Boy

Color, Sega's Dreamcast, Saturn and Genesis, and coin-operated arcade games.

### Materially False and Misleading Statements Made During the Class Period

28.     The Class Period Begins on December 11, 2001.  On that date, the Company issued

a registration statement and filed it with the SEC on Form S-3/A with respect to its offering of 4.5

million shares.  Therein, the Company stated:

> Our game development personnel are organized in teams.  The
> producers manage the work of the other team members and are
> responsible for the overall design of the game.  Each concept is
> reviewed initially for technical feasibility and evaluated relative to
> several factors, including whether the proposed product fits within
> our general strategy and profitability objectives. **Our management
> team meets regularly to formally review and evaluate the
> progress and quality of each title in development.** (Emphasis
> added.)

29.     On December 19, 2001, Midway announced the successful launch of its Public

Offering ("Offering") of 4,500,000 shares of common stock at $15.00 per share, wherein it obtained

-8-

net proceeds of approximately $63.3 million. The Company also stated its intention to use the net proceeds of the offering for product development, working capital and other general corporate purposes.

30. On February 25, 2002, the Company issued a press release wherein it reported that revenues during the quarter ended December 31, 2001 were $43,720,000, down from $76,995,000 in the prior year period. The net loss during the December 31, 2001 quarter was $305,000 or $0.01 per share excluding preferred stock charges, compared with a net loss of $3,011,000 or $0.08 per share, in the prior year period.

31. Importantly, the Company provided the following Guidance:

> **For the fiscal year ending December 31, 2002, Midway expects to ship over forty new home videogame products, including highly anticipated games such as *Mortal Kombat: Deadly Alliance, Freaky Flyers, MLB SlugFest 20-03,* and *Defender*. The company anticipates net sales of $330 million to $340 million for the full year.** (Emphasis added.)

32. Moreover, the Company announced the following release schedule for 2002:

| Quarter Ending | PlayStation 2 | GameCube | Xbox | Game Boy Advance |
|---|---|---|---|---|
| 3/31/02 | NFL Blitz 20-02 | Gauntlet Dark Legacy<br>NFL Blitz 20-02<br>SpyHunter | NFL Blitz 20-02<br>SpyHunter | |
| 6/30/02 | Fireblade<br>Gravity Games BMX<br>Legion: Legend of Excalibur<br>MLB SlugFest 20-03<br>Red Card Soccer | Gravity Games BMX<br>Red Card Soccer | Gauntlet Dark Legacy<br>Gravity Games BMX<br>Red Card Soccer | SpyHunter |
| 9/30/02 | Mortal Kombat:<br>Deadly Alliance<br>NFL Blitz 20-03<br>NHL Hitz 20-03 | MLB SlugFest 20-03<br>Mortal Kombat:<br>Deadly Alliance<br>NFL Blitz 20-03<br>NHL Hitz 20-03 | MLB SlugFest 20-03<br>Mortal Kombat:<br>Deadly Alliance<br>NFL Blitz 20-03<br>NHL Hitz 20-03 | NFL Bliz 20-03 |

| 12/31/02 | Defender Dr. Muto Freaky Flyers NBA Basketball | Defender Dr. Muto Freaky Flyers NBA Basketball | Defender Freaky Flyers NBA Basketball | Mortal Kombat: Deadly Alliance |

33.    On March 28, 2002, Midway filed with the SEC its half-yearly report on Form 10-KT405 for the six-month period ended December 31, 2001, reflecting the Company's transition of its fiscal year from a fiscal year ending on June 30 to a fiscal year ending on December 31.  The Company's Form KT405, signed by the Individual Defendants, reaffirmed the Company's previously announced 2002 release schedule:

| Quarter Ending | PlayStation 2 | GameCube | Xbox | Game Boy Advance |
|---|---|---|---|---|
| 3/31/02 | NFL Blitz 20-02 | Gauntlet Dark Legacy NFL Blitz 20-02 SpyHunter | NFL Blitz 20-02 SpyHunter | |
| 6/30/02 | Fireblade Gravity Games BMX Legion: Legend of   Excalibur MLB SlugFest 20-03 Red Card Soccer | Gravity Games BMX Red Card Soccer | Gauntlet Dark Legacy Gravity Games BMX Red Card Soccer | SpyHunter |
| 9/30/02 | Mortal Kombat:   Deadly Alliance NFL Blitz 20-03 NHL Hitz 20-03 | MLB SlugFest 20-03 Mortal Kombat:   Deadly Alliance NFL Blitz 20-03 NHL Hitz 20-03 | MLB SlugFest 20-03 Mortal Kombat:   Deadly Alliance NFL Blitz 20-03 NHL Hitz 20-03 | NFL Bliz 20-03 |
| 12/31/02 | Defender Dr. Muto Freaky Flyers NBA Basketball | Defender Dr. Muto Freaky Flyers NBA Basketball | Defender Freaky Flyers NBA Basketball | Mortal Kombat: Deadly Alliance |

34.    On April 30, 2002, the Company issued a press release wherein it reported its results for the quarter ended March 31, 2002.  Therein, the Company reported that revenues during the quarter were $31,007,000, up from $23,723,000 in the prior year period.  The pre-tax net loss during the March 31, 2002 quarter was $5,076,000 excluding preferred stock dividends and one-time

charges associated with the consolidation of administrative facilities, compared with a pre-tax net

loss of $22,213,000, excluding $3,639,000 of one-time restructuring and other charges, in the prior

year period.

35. Importantly, the company provided the following Guidance:

**For the quarter ending June 30, 2002, Midway expects to ship nine new home videogame console products and anticipates net sales of $40 million to $50 million.** Midway expects a pre-tax loss of between $5 million and $10 million in the quarter ending June 30, 2002 prior to estimated preferred stock charges of $2,687,000 and excluding a one-time charge associated with the consolidation of administrative facilities from Corsicana, Texas estimated to be between $1.0 million and $1.7 million.

**For the full year ending December 31, 2002, Midway reiterates the previously stated guidance of net sales between $330 million and $340 million.** The Company also reiterates previously stated guidance for pre-tax income of between $49 million and $54 million for the full year, excluding one-time charges associated with the consolidation of administrative facilities from Corsicana, Texas estimated to be between $2.3 million and $3.0 million for the year, and prior to estimated preferred stock charges of $11.1 million. Due to net operating loss carry forwards, the Company does not anticipate incurring income tax expense in 2002.

The Company expects to ship at least 32 new home videogame console products during the remaining three quarters of 2002 across multiple platforms and genres. **Midway believes these products comprise the strongest home videogame lineup in the Company's history and that these products will produce record home videogame results in 2002.** Midway believes that the lineup of games it will present at the Electronic Entertainment Exposition (E3) convention in May to be among the strongest in the industry and include Mortal Kombat: Deadly Alliance, NFL Blitz 20-03, Freaky Flyers, Dr. Muto. (Emphasis added.)

36.    Further, the Company announced the following release schedule (bolded  titles indicate insertion of a delayed product; parenthetical titles indicate either cancelled products or products delayed until the next fiscal year):

| Quarter Ending | PlayStation 2 | GameCube | Xbox | Game Boy Advance |
|---|---|---|---|---|
| 6/30/02 | Fireblade<br>Gravity Games BMX<br>Legion: Legend of<br>   Excalibur<br>MLB SlugFest 20-03<br>Red Card Soccer | Red Card Soccer | Gauntlet Dark Legacy<br>Gravity Games BMX<br>Red Card Soccer | SpyHunter |
| 9/30/02 | Mortal Kombat:<br>   Deadly Alliance<br>NFL Blitz 20-03<br>NHL Hitz 20-03 | **Gravity Games<br>   BMX**<br>MLB SlugFest 20-03<br>Mortal Kombat:<br>   Deadly Alliance<br>NFL Blitz 20-03<br>NHL Hitz 20-03 | MLB SlugFest 20-03<br>Mortal Kombat:<br>   Deadly Alliance<br>NFL Blitz 20-03<br>NHL Hitz 20-03 | NFL Bliz 20-03 |
| 12/31/02 | Defender<br>Dr. Muto<br>Freaky Flyers<br>TBA: Traveler's<br>   Tales Title<br>(NBA Basketball) | Defender<br>Fireblade<br>Freaky Flyers<br>(NBA Basketball) | Defender<br>(Fireblade)<br>(Dr. Muto)<br>Freaky Flyers<br>   (NBA Basketball) | Mortal Kombat:<br>   Deadly Alliance<br>Gauntlet: Dark<br>   Legacy<br>Justice League<br>NHL Hitz 20-03 |

37.    The Company's earnings release was followed by a conference call during which defendants reviewed the Company's performance.  With respect to the Company's guidance for the remainder of the fiscal year, defendant Nicastro again reiterated:

> For the quarter ended June 30, 2002, Midway expects to ship
> nine new home video game products and anticipates net sales of
> $40 to $50 million ... For the full year ending December 31, 2002,
> Midway reiterates the previously stated guidance of net sales of
> between 330 million and $340 million and pretax income of
> between 49 million and $54 million, excluding one-time charges
> associated with consolidation of administrative facilities from
> Corsicana, Texas, estimated to be between 2.3 and $3 million and
> estimated preferred stock charges of 11.1 million. (Emphasis added.)

-12-

38.    Moreover, regarding the Company's outlook, defendant Nicastro stated:

> **Looking more broadly at the industry's performance in the
> March quarter, we believe the results were solid and bode well
> for the rest of the year.** According to NPD group, software sales in
> the first quarter rose 26% while combined hardware and software
> dollar sales climbed 20% versus the same period last year. Sony's
> PlayStation 2 continues to be the hardware market leader, selling
> through approximately 370,000 units in the first quarter compared to
> approximately140,000 Xbox units and approximately 115,000
> GameCube units. **For the full year 2002, we expect hardware and
> software sales growth consistent with most analysts' expectations.**
> (Emphasis added.)

Analyst expectations during the time period immediately before the conference call date of April

30, 2002 ranged from EPS estimates of $0.68 to $1.00, and FY02 revenue estimates of $338 to $400

million.

39.    During the April 30, 2002 conference call, defendant Nicastro also stated:

> Over all, we project video game software sales will grow between
> 20% and 30% in 2002. Midway is well position to do capitalize on
> this industry growth, with a broad portfolio of products all three next
> generation platforms and the GameBoy Advance. **This portfolio
> includes market-proven franchises and brands together with
> exciting new products which we expect will develop into new
> franchises for the future. This portfolio is deep.** We plan on
> introducing over 38 new home video game releases during the next
> three-quarters. It is also broad covering the most profitable genres in
> the industry including baseball, soccer, hockey, football, fighting,
> action, extreme games, racing adventure, RPG, and platform
> adventure. And perhaps most importantly, it is full of high-quality,
> innovative and fun games. **We expect that a number of these
> products can become breakaway hits.** (Emphasis added.)

40.    Importantly, in response to analyst concerns regarding Midway's ability to promptly

deliver *Mortal Kombat*, one of its most important products during the relevant period, defendant

Nicastro stated:

> There's a handful of titles that as we're getting closer and closer to their introduction, our level of excitement and confidence in their ability to be strong sellers has been going up. Mortal Kombat is clearly one of them. I think that as time has gone by our management group is become even more bullish on what Mortal Kombat can ultimately do in the marketplace. It's looking terrific.

* * *

> Mortal Kombat is going to ship at the end of September, and that's been the plan . . . since the beginning.

41.     Moreover, in response to analyst concerns about whether the Company would meet its year-end revenue targets, defendant Nicastro responded:

> I think that the simple answer . . . is look at the product you sell, because that's -- the product is what's going to generate the profits. If we have a good product and it sells well, we're going to generate strong revenues and strong profits. And I think that that's kind of an easy one for you and for those who are at least able to attend the [upcoming Electronic Entertainment Exposition] show.

42.     On May 14, 2002, the Company filed with the SEC, on Form 10-Q, its quarterly report for the first quarter ended March 31, 2002. More specifically, the Form 10-Q, signed by defendant Powell, stated:

> Home videogame revenues increased 149% to $30,265,000 for the three months ended March 31, 2002 compared to $12,138,000 for the three months ended March 31, 2001. The increase is primarily due to our strategy for the platform transition from 32 and 64-bit home videogame consoles to the new generation 128-bit consoles including Sony's PlayStation 2, Nintendo's GameCube and Microsoft's Xbox. The three months ended March 31, 2002 primarily consisted of new generation console game sales as compared to the comparable prior period that consisted primarily of 32 and 64-bit console game sales. Because it takes on average 18 to 24 months to develop a title for a new generation console, Midway is not expected to experience the full benefit of this strategy until later in 2002.

43.     The statements referenced above in ¶¶ 28-42 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them:

(a) that the Company was experiencing material disruptions in its internal studios such that it would be unable to meet the expected release dates for its major new game titles;

(b) that the Company's inability to develop new game titles in a timely manner was negatively impacting its ability to increase revenues and earnings; and

(c) as a result of the foregoing, defendants' lacked a reasonable basis for their earnings projections for the Company, which were therefore materially false and misleading.

44.     Then, on July 2, 2002, the Company announced that it was reducing its revenue and earnings guidance for its second quarter and full-year 2002 results. More specifically, the Company reported that it expected revenues for the quarter ended June 30, 2002 to be between $28 and $30 million, as opposed to the previous guidance of $40 to $50 million. Further, Midway reported that for the year ending December 31, 2002, it expected revenues between $295 and $310 million, as opposed to the previous guidance of $330 to $340 million.

45.     In the press release, Midway stated that the revised guidance was necessary due to the delay of products originally scheduled to ship during the quarter, as well as lower-than-expected sales of games launched late in the quarter. Most importantly, included among the delayed products was Mortal Kombat, which was pushed back from the announced release date of September 2002 to the first half of the quarter ending December 31, 2002.

46.     In response to the Company's revised guidance, Midway's shares fell over 51%, or $4.14 a share, to close at $3.85 per share.

-15-

47.     On July 31, 2002, the Company issued a press release wherein it reported its results for the quarter ended June 30, 2002. Therein, the Company reported that for the quarter ended June 30, 2002, revenues were $28.1 million and the pre-tax loss was $10.7 million excluding approximately $16.7 million of preferred stock charges and $0.5 million of charges associated with the consolidation of administrative facilities from Corsicana, Texas. Moreover, the Company issued the following guidance:

> For the quarter ending September 30, 2002, Midway expects to ship ten new home videogame products and anticipates net sales of between $50.0 million and $55.0 million. Midway expects a pre-tax loss of between $5.0 million and $7.0 million in the quarter ending September 30, 2002 prior to estimated preferred stock charges of approximately $0.3 million and excluding charges associated with the consolidation of administrative facilities estimated to be between $0.2 million and $0.4 million.
>
> **For the year ending December 31, 2002, Midway reiterates the previously stated guidance of net sales between $295.0 million and $310.0 million.**
>
> * * *
>
> Midway expects to ship 29 new home videogame products during the remaining two quarters of 2002 across multiple platforms and genres. **The Company believes these products comprise the strongest home videogame lineup in Midway's history and that these products will produce record home video game revenues in 2002.**

48.     Importantly, the Company announced the following release schedule (bolded titles indicate insertion of a delayed product; parenthetical titles indicate either cancelled products or products delayed until the next fiscal year):

-16-

| Quarter Ending | PlayStation 2 | GameCube | Xbox | Game Boy Advance |
|---|---|---|---|---|
| 9/30/02 | NFL Bliz 20-03<br>NHL Hitz 20-03 | MLB Slugfest 20-03<br>NFL Bliz 20-03<br>NHL Hitz 20-03<br>(Gravity Games BMX) | **Gravity Games<br>Bike: Street.<br>Vert.<br>Dirt.**<br>MLB Slugfest 20-03<br>NFL Bliz 20-03<br>NHL Hitz 20-03 | NFL Bliz 20-03 |
| 12/31/02 | Defender<br>Dr. Muto<br>Freaky Flyers<br>Haven: Call of the King<br>**Mortal Kombat:<br>Deadly Alliance** | Defender<br>Fireblade<br>**Mortal Kombat:<br>Deadly Alliance** | Defender<br>Dr. Muto<br>Freaky Flyers<br>**Mortal Kombat:<br>Deadly Alliance** | Defender<br>Gauntlet: Dark Legacy<br>Justice League<br>MLB Slugfest 20-03<br>Mortal Kombat:<br>Deadly Alliance<br>NHL Hitz 20-03 |

49.     On August 13, 2002, the Company filed with the SEC, on Form 10-Q, its report for the quarter ended June 30, 2002. The Company's Form 10-Q, signed by defendant Powell, reaffirmed the Company's previously announced results.

50.     On October 29, 2002, the Company issued a press release announcing its results for the period ended September 30, 2002. Therein, Midway reported that revenue for the quarter ended September 30, 2002 was $52.6 million. The pre-tax loss for the quarter ended September 30, 2002 was $11.3 million, excluding $0.2 million of charges incurred with the consolidation of administrative facilities from Corsicana, Texas.

51.     Importantly, the Company also issued the following guidance, reiterating its fourth quarter projections and reducing its previously announced projections for FY2002 revenues:

> **For the quarter ending December 31, 2002, Midway expects revenue of between $105.0 million and $155.0 million,** a 140% to 250% increase over revenue from the prior year period of $43.7 million. Midway expects pre-tax earnings of between $15.0 million and $40.0 million in the fourth quarter compared to a pre-tax net loss

-17-

in the prior year period of $0.3 million excluding preferred stock charges.

**For the year ending December 31, 2002, Midway expects revenue of between approximately $217.0 million and $267.0 million,** and pre-tax earnings of between a loss of approximately $12.0 million and a gain of approximately $13.0 million. . .

52.     Furthermore, the Company announced the following release schedule, again announcing delays of various titles from prior announcements (bold titles indicate insertion of a delayed product; parenthetical titles indicate either cancelled products or products delayed until the next fiscal year):

| Quarter Ending | PlayStation 2 | GameCube | Xbox | Game Boy Advance |
|---|---|---|---|---|
| 12/31/02 | Defender<br>Dr. Muto<br>**(Freaky Flyers)**<br>Haven: Call of the King<br>Mortal Kombat: Deadly Alliance | Defender<br>Dr. Muto<br>Fireblade<br>Mortal Kombat: Deadly Alliance | Defender<br>Dr. Muto<br>**(Freaky Flyers)**<br>Mortal Kombat: Deadly Alliance | Defender<br>Gauntlet: Dark Legacy<br>Justice League<br>**(MLB Slugfest 20-03)**<br>Mortal Kombat: Deadly Alliance<br>NHL Hitz 20-03 |

53.     The Company's earnings release was followed by a conference call during which defendants reviewed the Company's performance.   Defendant Nicastro, commenting on the Company's projected revenues, stated "**we expect revenue for the December quarter will grow to $105 to $155 million, or 140 percent to 250 percent higher than last year.**" (Emphasis added.)

54.     On November 14, 2002, the Company filed with the SEC, on Form 10-Q, its report for the quarter ended September 30, 2002. The Company's Form 10-Q, signed by defendant Powell, reaffirmed the Company's previously announced results

55.     On December 23, 2002, the Company issued a press release, once again announcing a revised guidance, stating that it expected revenues for the fourth quarter ending December 31, 2002 to be between $78.0 million and $83.0 million, compared to the Company's previous revenue

-18-

guidance of between $105.0 million and $155.0 million. The Company attributed this decrease to lower than expected demand for Defender, Dr. Muto and Haven: Call of the King, which was only partially offset by higher than expected demand for Mortal Kombat: Deadly Alliance. Moreover, the Company announced that for the full year ending December 31, 2003, Midway expected revenues of between $250 and $275 million.

56.     On February 20, 2003, the Company issued a press release announcing its results for the quarter ended December 31, 2002. Therein, the Company reported revenue of $80.2 million and a loss applicable to common stock of $25.0 million or $0.54 per share in the quarter ended December 31, 2002. Revenue for the year ended December 31, 2002 was $191.9 million, and a loss applicable to common stock of $73.6 million or $1.61 per share in the twelve months ended December 31, 2002.

57.     Importantly, the Company announced the following guidance:

> For the quarter ending March 31, 2003, Midway expects revenue of between $40.0 million and $45.0 million, approximately a 29% to 45% increase over revenue of $31.0 million in the first quarter of 2002. The Company expects a pre-tax loss of between $3.0 million and $5.5 million in the quarter ending March 31, 2003, excluding approximately $6.2 million of restructuring charges associated with the consolidation of product development operations in California.

> The Company expects two major product introductions in the quarter ending March 31, 2003 including the European launch of Mortal Kombat: Deadly Alliance for all platforms and the domestic launch of MLB SlugFest 20-04 for all platforms. The successful launch of Mortal Kombat: Deadly Alliance in Europe last week represented Midway's largest ship-in sales volume for one title since the Company opened its European office in 1999. **The Company also expects the launch of MLB SlugFest 20-04 to be very successful as preliminary consumer and retailer interest in the follow-up to last year's top-performing PlayStation 2 baseball title is very strong.**

> **For the year ending December 31, 2003, Midway reiterates its previous guidance of revenues of between $250.0 million and $275.0 million,** an approximate 30% to 43% increase over 2002 revenues, with pre-tax earnings of between $20.0 million and $30.0 million, excluding any restructuring charges

58.     On March 28, 2003, the Company filed with the SEC, on Form 10-K, its report for the fiscal year ended December 31, 2002. The Company's Form 10-K, signed by the Individual Defendants, reaffirmed the Company's previously announced results

59.     On April 29, 2003, the Company issued a press release announcing its results for the first quarter ended March 31, 2003, wherein it reported revenues of $45.8 million. In terms of guidance, the Company stated that it only expected $7 to $11 million for the second quarter of 2003. Moreover, Midway once again slashed its previous guidance for the year ending December 31, 2003, estimating revenues of only **$200 million and $230 million,** as opposed to the $250 to $275 it had previously announced.

60.     On May 15, 2003, the Company filed with the SEC, on Form 10-Q, its report for the quarter ended March 31, 2003. The Company's Form 10-Q, signed by defendant Powell, reaffirmed the Company's previously announced results.

61.     The statements referenced above in ¶¶ 44-45, 47-60 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them:

(a) that the Company was experiencing material disruptions in its internal studios such that it would be unable to meet the expected release dates for its major new game titles;

(b) that the Company's inability to develop new game titles in a timely manner was negatively impacting its ability to increase revenues and earnings;

-20-

(c) that the Company was experiencing decreased consumer demand for its released products; and

(d) that as a result of the foregoing, defendants' lacked a reasonable basis for their earnings projections for the Company, which were therefore materially false and misleading.

## THE TRUTH BEGINS TO EMERGE

62.     On July 29, 2003, the Company announced its results for the third quarter ended March 31, 2003. To the shock of the investment community, Midway disclosed that it generated a mere $5 million, failing to meet even its paltry estimates of $7-11 million. The revenue decline was attributed to the delay in the release of a number of titles. The Company also announced that David F. Zucker succeeded Neil D. Nicastro as chief executive officer and president of Midway Games Inc.

63.     Midway's July 29th announcement shocked the markets, causing the Company's already depressed shares to slide downwards more than 28%, or $0.97 a share, to close at $2.42 per share on July 30, 2003.

## UNDISCLOSED ADVERSE INFORMATION

64.     The market for Midway's publicly traded securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Midway's publicly traded securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Midway publicly traded securities relying upon the integrity of the market price of Midway's publicly traded securities and market information relating to Midway, and have been damaged thereby.

65.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Midway's publicly traded securities, by publicly issuing false and misleading

-21-

statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

66. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Midway's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Midway and its business, prospects and operations, thus causing the Company's publicly traded securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's publicly traded securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

67. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of

information reflecting the true facts regarding Midway, their control over, and/or receipt and/or modification of Midway's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Midway, participated in the fraudulent scheme alleged herein.

68.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

69.     At all relevant times, the market for Midway's publicly traded securities was an efficient market for the following reasons, among others:

(a)  Midway's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)  As a regulated issuer, Midway filed periodic public reports with the SEC and the NYSE;

(c)  Midway regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

-23-

(d) Midway was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

70. As a result of the foregoing, the market for Midway's publicly traded securities promptly digested current information regarding Midway from all publicly available sources and reflected such information in Midway's stock price. Under these circumstances, all purchasers of Midway's publicly traded securities during the Class Period suffered similar injury through their purchase of Midway's publicly traded securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

71. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Midway who knew that those statements were false when made.

-24-

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

72.     Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein. This claim is asserted against all defendants.

73.     During the Class Period, defendant Midway and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Midway's publicly traded securities; and (c) cause plaintiff and other members of the Class to purchase Midway's publicly traded securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants Midway and the Individual Defendants, and each of them, took the actions set forth herein.

74.     These defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Midway's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of Midway, as alleged below.

-25-

75. In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

76. Midway and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Midway as specified herein.

77. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Midway's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Midway and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein,

and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Midway's securities during the Class Period.

78.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

79.     These defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Midway's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such

knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

80.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Midway's securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of Midway's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Midway securities during the Class Period at artificially high prices and were damaged thereby.

81.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Midway, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Midway publicly traded securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

82.     By virtue of the foregoing, Midway and the Individual Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

83. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act Against the Individual Defendants

84. Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein. This claim is asserted against the Individual Defendants.

85. Each of the Individual Defendants acted as a controlling person of Midway within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86. In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or

-29-

influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

87.     As set forth above, Midway and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: September 26, 2003

ALLEN EHRLICH, individually and on behalf of all others similarly situated, Plaintiff

By:

Marvin A. Miller
Jennifer W. Sprengel
Matthew E. Van Tine
**MILLER FAUCHER and CAFFERTY LLP**
30 North LaSalle Street
Suite 3200
Chicago, Illinois  60602
(312) 782-4880

*Designated as Local Counsel*

Marc A. Topaz
Richard A. Maniskas
Edward W. Chang
**SCHIFFRIN & BARROWAY, LLP**
Three Bala Plaza East
Suite 400
Bala Cynwyd, Pennsylvania  19004
(610) 667-7706

Samuel H. Rudman
David A. Rosenfeld
**CAULEY GELLER BOWMAN & RUDMAN LLP**
200 Broadhollow Road, Suite 200
Melville, New York  11747
(631) 367-7100

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Allen Ehrlich, (Plaintiff) declares, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the Complaint and retains Schiffrin & Barroway, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transactions in the Midway Games, Inc. (NYSE: MWY) security that is the subject of this action during the Class Period are as follows:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 600 | Bought | 12/20/02 | $4.50 |
| 150 | Bought | 12/9/02 | $6.05 |
| 600 | Sold | 7/21/03 | $3.23 |

List additional transactions on a separate sheet of paper, if necessary.

5. During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws: N/A

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22 day of September , 2003.

**ALLEN EHRLICH**

Civil Cover Sheet

*Cat 1*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**DOCKETED**

SEP 2 9 2003

# Civil Cover Sheet

**03C 6821**

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

JUDGE JOAN H. LEFKOW

| | |
|---|---|
| **Plaintiff(s): ALLEN EHRLICH, individually and on behalf of all others similarly situated,** | **Defendant(s):MIDWAY GAMES, INC., et al.,** |
| County of Residence: Washtenaw | County of Residence: MAGISTRATE JUDGE |
| Plaintiff's Atty: Miller Faucher and Cafferty LLP 30 North LaSalle Street, Suite 3200 Chicago, Illinois 60602 (312) 782-4880 | Defendant's Atty: GERALDINE SOAT BROWN |

**II. Basis of Jurisdiction:**     **3. Federal Question (U.S. not a party)**

**III. Citizenship of Principal Parties (Diversity Cases Only)**
          Plaintiff:-N/A
          Defendant:-N/A

FILED-EDS
03 SEP 26 PH 2: 43
CLERK
U.S. DISTRICT COURT

**IV. Origin :**          **1. Original Proceeding**

**V. Nature of Suit:**          **850 Securities / Commodities / Exchange**

**VI.Cause of Action:**          **15 U.S.C. §§ 78j(b) and 78t(a)**

**VII. Requested in Complaint**
          Class Action:Yes
          Dollar Demand:
          Jury Demand:Yes

**VIII.** This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date: 9/26/03

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**          Revised: 06/28/00

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

DOCKETED

SEP 2 9 2003

In the Matter of

**ALLEN EHRLICH,**

v.

**03C 6821**

Case Number:

**MIDWAY GAMES, INC., et al.,**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Allen Ehrlich, individually and on behalf of all others similarly situated, Plaintiff JUDGE JOAN H. LEFKOW

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

| (A) | | | (B) | | |
|---|---|---|---|---|---|
| SIGNATURE *Marc A. Topaz /mbm* | | | SIGNATURE | | |
| NAME Marc A. Topaz | | | NAME Marvin A. Miller | | |
| FIRM Schiffrin & Barroway, LLP | | | FIRM Miller Faucher and Cafferty LLP | | |
| STREET ADDRESS Three Bala Plaza East, Suite 400 | | | STREET ADDRESS 30 North LaSalle Street, Suite 3200 | | |
| CITY/STATE/ZIP Bala Cynwyd, Pennsylvania 19004 | | | CITY/STATE/ZIP Chicago, Illinois 60602 | | |
| TELEPHONE NUMBER (610) 667-7706 | FAX NUMBER | | TELEPHONE NUMBER (312) 782-4880 | FAX NUMBER 782-4485 | |
| E-MAIL ADDRESS | | | E-MAIL ADDRESS mmiller@millerfaucher.com | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 01916769 | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☑ | MEMBER OF TRIAL BAR? | YES ☒ | NO ☐ |
| TRIAL ATTORNEY? | YES ☑ | NO ☐ | TRIAL ATTORNEY? | YES ☒ | NO ☐ |
| | | | DESIGNATED AS LOCAL COUNSEL? | YES ☒ | NO ☐ |
| (C) | | | (D) | | |
| SIGNATURE *Richard A. Maniskas /mbm* | | | SIGNATURE *Jennifer W. Sprengel /mbm* | | |
| NAME Richard A. Maniskas | | | NAME Jennifer W. Sprengel | | |
| FIRM Same as (A) | | | FIRM Same as (B) | | |
| STREET ADDRESS | | | STREET ADDRESS | | |
| CITY/STATE/ZIP | | | CITY/STATE/ZIP | | |
| TELEPHONE NUMBER | FAX NUMBER | | TELEPHONE NUMBER | FAX NUMBER | |
| E-MAIL ADDRESS | | | E-MAIL ADDRESS jsprengel@millerfaucher.com | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06204446 | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☑ | MEMBER OF TRIAL BAR? | YES ☐ | NO ☑ |
| TRIAL ATTORNEY? | YES ☑ | NO ☐ | TRIAL ATTORNEY? | YES ☑ | NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | DESIGNATED AS LOCAL COUNSEL? | YES ☑ | NO ☐ |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

**DOCKETED**

In the Matter of

**ALLEN EHRLICH,**

v.

Case Number: 03C 6821

SEP 29 2003

**MIDWAY GAMES, INC., et al.**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Allen Ehrlich, individually and on behalf of all others similarly situated, Plaintiff

JUDGE JOAN H. LEFKOW

MAGISTRATE JUDGE GERALDINE SOAT BROWN

| (E) | (F) |
|---|---|
| SIGNATURE *Edward W. Chang /mbm* | SIGNATURE *Matthew E. Van Tine /mbm* |
| NAME Edward W. Chang | NAME Matthew E. Van Tine |
| FIRM Same as (A) | FIRM Same as (B) |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER / FAX NUMBER | TELEPHONE NUMBER / FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS mvantine@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6186180 |
| MEMBER OF TRIAL BAR? YES ☐ NO ☑ | MEMBER OF TRIAL BAR? YES ☑ NO ☐ |
| TRIAL ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☑ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☑ NO ☐ |

| (G) | (H) |
|---|---|
| SIGNATURE *Samuel H. Rudman /mpm* | SIGNATURE *David A. Rosenfeld /mbm* |
| NAME Samuel H. Rudman | NAME David A. Rosenfeld |
| FIRM Cauley Geller Bowman & Rudman LLP | FIRM Same as (G) |
| STREET ADDRESS 200 Broadhollow Road, Suite 200 | STREET ADDRESS |
| CITY/STATE/ZIP Melville, New York 11747 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (631) 367-7100 / FAX NUMBER | TELEPHONE NUMBER / FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☑ | MEMBER OF TRIAL BAR? YES ☐ NO ☑ |
| TRIAL ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☑ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☑ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☑ |