# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 6821 | **DATE** | 8/27/2004 |
| **CASE TITLE** | In Re: Midway Games, Inc. Securities Litigation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, defendants' motion to dismiss [#22] is granted. Case dismissed. Case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 5 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | AUG 3 1 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | JXM | 36 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 8/27/2004 | |
| | | | date mailed notice | |
| MD | courtroom deputy's initials | 2004 AUG 27 PM 3:05<br>U.S. DISTRICT COURT<br>CLERK<br>FILED<br>Date/time received in central Clerk's Office | MD | mailing deputy initials |

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DOCKETED

AUG 3 1 2004

|  |  |  |
|---|---|---|
| IN RE MIDWAY GAMES, INC. | ) | 03 C 6821 |
| SECURITIES LITIGATION | ) | Judge Joan H. Lefkow |
|  | ) |  |

## MEMORANDUM OPINION AND ORDER

Lead plaintiffs, William Lindesmith, Lance Coren, Paul Stanley Cobb, Jr., Maurice W.

Mihelich, and Leonard and Carol E. Willig, as trustees for the Willig Living Trust and as Joint

Tenants with Rights of Survivorship, bring this suit on behalf of a putative class of persons who

purchased common stock of defendant, Midway Games, Inc. ("Midway"), between December 11,

2001 and July 30, 2003. Count I alleges that Midway and its senior management, Neil D.

Nicastro, Thomas E. Powell, and Kenneth J. Fedesna (collectively, "individual defendants" and,

with Midway, "defendants") violated section 10(b) of the Securities Exchange Act of 1934, 15

U.S.C. § 78j(b) ("Exchange Act"), and Rule 10b-5 promulgated under § 78j(b), 17 C.F.R.

§ 240.10b-5, by knowingly and/or recklessly making material misrepresentations or omissions

regarding Midway's operating conditions, business practices, and future business prospects. In

asserting this claim, plaintiffs rely on the fraud-on-the-market doctrine, which presumes that the

market price of a company's stock reflects all publicly available information about the company.

Count II asserts a claim against the individual defendants under section 20(b) of the Exchange

Act, which provides for joint and several liability of any person who "controls" any other person

liable under the Act. 18 U.S.C. § 17t(a). Defendants have moved to dismiss the Amended

Complaint for failure to state a claim upon which relief may be granted under Federal Rule of

Civil Procedure 12(b)(6) and for failure to satisfy the pleading requirements of Federal Rule of

Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) ("PSLRA"). For the reasons stated below, the motion is granted.

## MOTION TO DISMISS STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957); *Kennedy* v. *Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 695 (7th Cir. 1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson* v. *E.J. Brach Corp.*, 176 F.3d 971, 977 (7th Cir. 1999); *Zemke* v. *City of Chicago*, 100 F.3d 511, 513 (7th Cir. 1996).

In addition to the mandates of Rule 12(b)(6), Federal Rule of Civil Procedure 9(b) requires "all averments of fraud" to be "stated with particularity," although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." "The rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc.* v. *Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994); *see also DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("Although states of mind may be pleaded generally [under Rule 9(b)], the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story."). "'Because only a fraction of financial deteriorations reflects fraud,' . . .

2

plaintiffs in securities cases must provide enough information about the underlying facts to distinguish their claims from those of disgruntled investors." *Arazie* v. *Mullane*, 2 F.3d 1456, 1458 (7th Cir. 1993) (quoting in part *DiLeo*, 901 F.2d at 628).

Further, in addition to Rule 9(b), the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), imposes "heightened pleading requirements" to discourage claims of "so-called 'fraud by hindsight.'" *In re Brightpoint, Inc. Sec. Litig.*, No. IP99-0870-C-H/G, 2001 WL 395752, at *3 (S.D. Ind. Mar. 29, 2001). Section 78u-4(b) "requires a court to dismiss a complaint that fails to (1) identify each of the allegedly material, misleading statements, (2) state facts that provide a basis for allegations made on information and belief, or (3) state with particularity 'facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at *4.

## BACKGROUND[1]

Midway is a developer and publisher of interactive entertainment software. (Am. Compl. ¶ 2.) Neil D. Nicastro ("Nicastro") was, until May 7, 2003, Midway's President, Chairman, Chief Executive Officer, and Chief Operating Officer and, from May 7, 2003 through the end of the class period, Chairman. (*Id.* ¶ 21.) Thomas E. Powell ("Powell") was Midway's Executive Vice President, Chief Financial Officer, and Treasurer throughout the class period. (*Id.* ¶ 22.) Kenneth J. Fedesna ("Fedesna") was Midway's Executive Vice President--Product Development

---

[1] The facts in the Background section are taken from the Complaint and Midway's SEC filings, press releases, and conference calls submitted with Defendants' motion. Although the latter materials were not attached to the Complaint, they are referred to therein and central to plaintiffs' claims. The Court may take judicial notice of SEC filings without converting a motion to dismiss to a motion for summary judgment.*Stavros* v. *Exelon*, 2003 WL 21372468, at *8 n.8 (N.D. Ill. June 13, 2003). Likewise, the Court may also "examine documents that a defendant attached to a motion to dismiss ... if they are referred to in the plaintiff's complaint and are central to her claim." *Albany Bank & Trust Co.* v. *Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002).

and Director throughout the class period. (*Id.* ¶ 23.) Midway's management was responsible for preparing all financial statements filed with the SEC during the class period. (*Id.* ¶ 121.)

Prior to July 2001, Midway developed coin-operated arcade games as well as home video games, most recently for 32- and 64-bit home game consoles. In June 2001, Midway decided to exit the coin-operated video game market, choosing instead to focus exclusively on developing and publishing new titles for the 128-bit "next generation" game consoles and handheld games (*e.g.*, Microsoft's XBOX, Sony's PlayStation 2, and Nintendo's GameCube). (*Id.* ¶ 32.) The titles to be developed for these platforms included Mortal Kombat, Freaky Flyers, MLB SlugFest, and Defender. (*Id.* ¶¶ 59-60.)

In support of this new venture, Midway registered a new public offering of 4.5 million shares of common stock with the SEC on December 11, 2001. (*Id.* ¶ 55.) The Registration Statement, filed with the SEC on Form S-3/A, contained a section called "Risk Factors" stating, among other things, the following:

> We have experienced recent operating and net losses, and we anticipate future losses.
> Midway has not reported a net or operating profit since the second quarter of fiscal 2000.
> . . .
> We do not know when or whether we will become profitable again.
> . . .
> We may experience delays in introducing new products.
> From time to time, we have experienced delays in product introductions. The timing of a creative process is difficult to predict. Unanticipated delays could cause us to miss an important selling season. A delay in introducing products could also affect our development schedule for other products. In either case, we may not achieve our anticipated revenues.
> . . .
> Product returns and price adjustments could exceed our reserves.
> We accept product returns for defective products and sometimes provide replacements, markdowns or other credits to customers that hold slow-moving inventory of our games. At the time of product shipment, we establish reserves, including reserves under our policies for price protection and returns of defective products. These reserves are

established according to estimates of the potential for future returns of products based on historical return rates, seasonality of sales, retailer inventories of our products and other factors. If product returns, markdowns and credits exceed our reserves, our operating results and financial condition could be adversely affected.

(Def. Ex. 1.) The Registration Statement also stated,

This prospectus contains "forward-looking statements" within the meaning of the federal securities laws. . . . These statements describe our plans, strategies and goals and our beliefs concerning future business conditions and our business outlook based on currently available information. Forward-looking statements typically are identified by the use of terms such as "may," "will," "should," "expect," "anticipate," "believe," "estimate," "intend" and similar words, although some forward-looking statements are expressed differently.

(*Id.*)

On December 19, 2001, Midway issued a press release announcing the successful launch of its public offering and reporting that the offering generated net proceeds of approximately $63.3 million. (Am. Compl. ¶ 56.) The press release stated Midway's intention to use the net proceeds of the offering for product development, working capital, and other general corporate purposes. (*Id.* ¶ 55.) The press release also stated,

This press release contains forward-looking statements concerning the use of net proceeds from the public offering, future business conditions on the outlook for Midway . . . based on currently available information that involves risks and uncertainties. The Company's actual results could differ materially from those anticipated in the forward-looking statements as a result of these risks and uncertainties, including, without limitation, the financial strength of the videogame industry, dependence on new product introductions and the ability to maintain the scheduling of such introductions, technological changes, dependence on major platform manufacturers and other risks more fully described under "Risk Factors" in the Company's registration statement on Form S-3 filed with the Securities and Exchange Commission on December 11, 2001.

(Def. Ex. 2.)

During the next year and a half (the remainder of the class period), Midway made numerous statements (sometimes in documents filed with the SEC, sometimes in press releases,

sometimes in conference calls) regarding the company's current and expected future revenues and earnings and announcing anticipated release dates of new video game titles.[2] (*See, e.g.*, Am. Compl. ¶¶ 59, 60, 63, 64, 79, 80, 86, 87, 97, 100.) The release schedules identified the specific titles that Midway planned to introduce in each given quarter for each game platform, cautioning that the release dates were "approximate" and "subject to change." (*See* Def. Exs. 6, at 2; 11, at 2; 14, at 3.) Each of these statements was accompanied by language either reiterating or incorporating by reference the cautionary language regarding "forward-looking statements" contained in Midway's Registration Statement, quoted above, or similar language in Midway's Transition Period 10-K Statement or Midway's 10-K Statement for 2002. (*See* Def. Exs. 3, 4, 6-20, 22-26.)

According to the Complaint, the statements regarding the release schedules were materially false and misleading because defendants knew or recklessly disregarded that (1) given the tight time schedules dictated by defendants, Midway was unable to produce its game titles according to the schedule that it publicly released; (2) Midway was experiencing production delays across virtually all of its product lines and the games that it was producing were either riddled with bugs or of such poor quality that they were unlikely to be commercially successful; and (3) Midway's inability to timely produce its game titles was negatively affecting its sales and demand for its products was declining. (Am. Compl. ¶ 61.) Plaintiffs identify the following games that were delayed and or cancelled:

---

[2]Specific statements will be discussed below.

| Game Title (Platform) | Originally Scheduled Release (Quarter Ending) | Actual Release (Quarter Ending) |
|---|---|---|
| Gravity Games BMX (GameCube) | 6/30/02 | Cancelled |
| Gravity Games BMX (XBox) | 6/30/02 | 9/30/02 |
| Mortal Kombat: Deadly Alliance (PlayStation 2, GameCube, XBox) | 9/30/02 | 12/31/02 |
| NBA Basketball (PlayStation 2, GameCube, XBox) | 12/31/02 | Cancelled or delayed until next fiscal year |
| MLB Slugfest 2003 (Game Boy Advance) | 12/31/02 | Cancelled or delayed until next fiscal year |
| Freaky Flyers (PlayStation 2, XBox) | 12/31/02 | Cancelled or delayed until next fiscal year |

(*Id.* ¶¶ 60, 64, 80, 87.) Approximately eleven other titles (some for multiple platforms) were released on schedule. (*Id.*)

The Complaint cites a number of statements by former employees of Midway purportedly supporting plaintiffs' allegations that the release schedules were false and misleading. According to one former Games Artist employed by Midway from October 2000 to December 2002, W-1[3], Midway "was always late" with respect to projected game releases, and Midway senior management received advance notice of delays because they had to personally approve the releases. W-1 further stated that "we knew that Midway was in deep trouble. Financial trouble. Everyone kind of knew that, especially after they [asked] us to take a 10% pay cut." (*Id.* ¶ 38.) A former website producer, W-2, employed with Midway from 2000 to October 2003, stated that Midway's management issued projections based on unrealistic release dates for video games.

---

[3] "W-___" refers to a witness referenced in the Complaint.

W-2 stated that the release dates slipped in 2002 because project teams "did not have enough time" to create and develop the games." (*Id.* ¶ 39.) A former Quality Assurance Manager, W-3, employed by Midway from 1998 through 2003, also stated that Midway's management issued projections based on unrealistic release dates for video games. He explained that the average game title production cycle at Midway was two years. However, "what marketing usually did is cut production times in half. So basically what happened to the product team is that they had about two years of work that they had to complete in about a year, and that's generally why" release dates were not met throughout the class period. (*Id.* ¶ 40.) Finally, a former Vice President of Quality and Market Support, W-4, employed with Midway from 1998 to 2001, stated that Nicastro would ask how long it would take to develop a title and then mandate that it be done quicker. W-4 stated that Nicastro "did have a tendency to be unrealistic." (*Id.* ¶ 41.)

Plaintiffs allege that Midway's delays in producing its video game titles placed the company in a precarious position, given the fast-changing nature of the home video game market. "As product release deadlines came and went, the market for video games and what was considered 'hot' changed radically. . . . Often when the Company would belatedly complete a game and bring it to market, the title was no longer in the 'hot' segment of the market." (*Id.* ¶ 4.) As a result, Midway was stuck with a large inventory of games it could not sell.

Plaintiffs allege that defendants attempted to conceal the deterioration of Midway's business by engaging in two types of accounting manipulations in violation of Generally Accepted Accounting Principles ("GAAP"). First, plaintiffs allege that defendants manipulated Midway's reported revenue by failing to set adequate reserves for price protection, returns, and

8

discounts. In Midway's Transition Period 10-K filed with the SEC, Midway explained the

factors considered in setting reserves and the risks involved:

> Price protection, returns and discounts
> We record an allowance for price protection, returns and discounts at each balance sheet
> date. We base these allowances on expected trends and estimates. Several factors are
> used in developing these estimates, including: (a) prior experience with price protection,
> returns and discounts; (b) expected sell through rates for particular games; (c) expected
> rates of requests for such credits; (d) specific identification of problem accounts; and (e)
> exposures with major customers. Changes in these factors could result in variance in the
> amount of allowance required. For example, if customers request price protection in
> amounts exceeding the rate expected and if management agrees to grant it, then Midway
> may incur additional charges. Since these allowances are developed through a charge to
> net sales, increases in these allowances could reduce net sales to an extent greater than
> expected.

(Def. Ex. 5, at 29.) Similar statements were included in other filings during the class period,

including Midway's 10-Q for the first, second, and third quarters of 2002, (Def. Exs. 8, 13, and

16), Midway's 10-K for fiscal year 2002 (Def. Ex. 21), and Midway's 10-Q for the first quarter

of 2002 (Def. Ex. 24.)

According to plaintiffs, Midway "set reserves that were not reasonable or based on any

supportable methodologies." (*Id.* ¶¶ 43-46 and 124-27.) When asked about the propriety of

Midway's reserves, W-5, a former Midway employee who was hired specifically to establish

Midway's reserves, stated "reserves for the sales returns were out of whack" and compared the

process of computing reserves to "throwing a dart at a board." (*Id.* ¶ 43.) W-5 stated that

Midway's senior management often ignored W-5's recommended reserves because they were too

high or set reserves for the company without waiting for W-5's recommendation. W-5 also

claimed that Midway's senior management purposely understated sales return reserves so that

Midway could overstate its projections and sales revenue, stating "Midway was kind of throwing

out any kind of [reserve] number out there to get the kind of [revenue] number they wanted it to be for that quarter or year." W-5 also recalled that "the decisions in establishing the reserve went to the CFO level," and he thought Nicastro was also involved in establishing the comapny's reserves. (*Id.* ¶ 44.) Specifically, W-5 recalled that Midway inadequately funded the Marketing Development Fund reserve, which was used to subsidize in-store promotions of Midway products. W-5 stated that Midway established a reserve at 2% of sales to fund the promotions, but the company spent much more. (*Id.* ¶ 45.)

Plaintiffs also allege that defendants attempted to conceal the deterioration of Midway's business failing to timely write down its Capitalized Product Development Costs ("CPDC's"). CPDC's are costs associated with the research and development of a video game once it has attained "technological feasibility," *i.e.*, when the game becomes a viable product suitable for mass production. (*Id.* ¶ 48.) The advantage of characterizing costs as CPDC's rather than ordinary research and development expenses is that the company need not recognize the CPDC's as expenses on its income statement until the game is released to the market, at which point the company may incrementally amortize the CPDC's. In the event a game previously deemed technologically feasible becomes commercially unviable, however, a company must take an immediate write-down on the backlogged CPDC's. (*Id.*)

In several filings with the SEC during the class period, Midway described the process used to calculate CPDC's:

Capitalized software development
... Midway evaluates the recoverability of capitalized software development costs on a product-by-product basis. A charge is recorded when management's forecast for a particular game indicates that the unamortized capitalized costs exceed the net realizable value of that asset. The net realizable value is the estimated future gross revenue from

10

that game reduced by the estimated future cost of completing and selling that game. As a result, the forecasted sales for a given game are a sensitive factor in this calculation. If revised forecast game sales are less than management's current forecast it is possible the Company could record charges to write-down software development costs previously capitalized.

(Def. Ex. 21, at 29.) Midway also warned that revenues from such future products were subject to the vagaries of the video game market:

Our market is subject to rapid technological change. . . . We may not be able to identify accurately which emerging technologies will gain widespread acceptance. If we invest in the development of a videogame incorporating a new technology or for a new platform that does not achieve significant commercial success, our revenues from that product will be adversely affected.

(Ex. 5, at 12; *see also* Ex. 21, at 10.)

According to W-6, a former Supervisory Accountant employed with Midway during the class period, CPDC's were expressly approved by upper management. Specifically, W-6 stated, "the V.P. of Internal Development or the CEO would ultimately review the game demo, technical specifications or designs and conclude that the game is one that they wished to further develop. At that point, technological feasibility has been established and additional costs are capitalized." (*Id.* ¶ 49.) Furthermore, according to former Assistant Producer W-7, employed with Midway from 1997 to 2003, Nicastro had the "last word" on which games got cancelled. (*Id.* ¶ 50.)

At the beginning of the class period, Midway's CPDC's were approximately $19 million. During the class period, CPDC's rose to approximately $40 million. According to the Complaint, the games for which the CPDC's were incurred during this period were not viable, and defendants knew and/or recklessly disregarded this fact. Plaintiffs allege that Midway should have written off more than $20 million in CPDC's by early 2003 but told investors that the games were still viable, keeping the CPDC's off of Midway's income statement. (*Id.* ¶ 51.)

During an April 29, 2003 conference call, a stock market analyst asked Nicastro whether Midway anticipated writing down any of the CPDC's:

> Analyst: "OK. The capitalized software, with canceling projects, that sort of thing, do you think there's a charge coming there? Because, the balance is pretty high? At least relative to the revenue run, right?"

> Nicastro: "Well, we have gone through and examined all of our products in the pipeline. And, as an outcome of that, we've taken some of the products out. And we're taking charges for that. So, right now what's on the balance sheet reflects products that we believe strongly in, and feel have commercial viability. So, we don't see anything forthcoming at this time. And that represents . . . games that are going to be released not just in 2003, but 2004."

(*Id.* ¶ 52.)

On April 29, 2003, Midway announced that it was commencing a private placement of Midway preferred convertible stock, which would raise $35 million in working capital. (*Id.* ¶ 11.) The placement was completed on May 19, 2003. The private placement was converted to a "public offering" through subsequent registration of the shares. (*Id.* ¶ 107.) Shortly after announcing the private placement, on May 7, 2003, Midway fired Nicastro as CEO, COO and President and replaced him with David Zucker ("Zucker"). Nicastro retained his role as Chairman. (*Id.* ¶ 106.)

On July 21, 2003, Midway disclosed that the SEC requested information from the company as part of a formal investigation into the video game market (*In the Matter of Certain Video Game Manufacturers*). Media sources later reported that the SEC investigation centered around the adequacy of company product reserves and the propriety of capitalization expenses. (*Id.* ¶ 108.)

On July 29, 2003, Zucker held a conference call with investors to discuss Midway's

second quarter results. During the call, Zucker announced that Midway's results were down

approximately $5 million from the same period in the previous year. (*Id.* ¶ 109.) He also

announced a $23 million write-down of CPDC's in the second quarter of 2003. Zucker

explained that the write-down occurred because Midway decided to cancel the development of

two video games and revised the sales forecasts for certain other games. (*Id.* ¶ 112.) The

announcement of the write-down caused Midway's stock to drop more than 28% on July 30,

2003, or $0.97 per share, to close at $2.42 per share.[4] (*Id.* ¶ 113.) Plaintiffs filed this suit on

September 26, 2003.

## DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934 provides,

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce or of the mails, or of any facility of any
> national securities exchange . . . [t]o use or employ, in connection with the
> purchase or sale of any security . . . [,] any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations as the [Securities and
> Exchange] Commission may prescribe as necessary or appropriate in the public
> interest or for the protection of investors.

Pursuant to this section, the SEC promulgated Rule 10b-5, which makes it unlawful for any

person

> (a) To employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue
> statement of a material fact or to omit to state a material fact necessary in order to
> make the statements made, in light of the circumstances under which they were
> made, not misleading, or (c) [t]o engage in any act, practice or course of business
> which operates or would operate as a fraud or deceit upon any person, in
> connection with the purchase or sale of any security.

---

[4] The highest price Midway's stock reached during the class period was $15.80, reached on December 24, 2001. (Am. Compl. ¶ 14.)

17 C.F.R. § 240.10b-5.

To establish liability under section 10(b) and Rule 10b-5, a plaintiff must prove that "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Caremark, Inc.* v. *Coram HealthCare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997); *Searls* v. *Glasser*, 64 F.3d 1061, 1066-67 (1995).

The PSLRA provides a safe harbor from liability for certain "forward-looking statements" that prove to be false.[5] 15 U.S.C. § 78u-5(c)(1). In that safe harbor, corporations and individual defendants may avoid liability for forward-looking statements that prove false if the statements are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* § 78u-5(c)(1)(A)(i). If the forward-looking statement is made orally, the safe harbor will apply if the statement

> (i) . . . is accompanied by an oral statement that additional information concerning factors that could cause actual results to differ materially from those in the forward-looking statement is contained in a readily available written document, or portion thereof;
> (ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the

---

[5]A forward-looking statement is defined to include

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure of other financial items;
(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
(C) a statement of future economic performance, including any such statement contained in a discussion and analysis by the management or in the results of operations included pursuant to the rules and regulations of the commission; . . . .

15 U.S.C. § 78u-5(i)(1).

forward-looking statement; and

(iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

15 U.S.C. § 78u-5(c)(2). If a forward-looking statement has no accompanying cautionary language, the safe harbor may still apply if the plaintiff fails to prove that the defendant made the statement with "actual knowledge" that it was "false or misleading." *Id.* § 78u-5(c)(1)(B). Subsection (b)(2)(A) excludes from the safe harbor any forward-looking statement, with or without meaningful cautionary language, that is "included in a financial statement prepared in accordance with generally accepted accounting principles."

## A. Allegedly False Statements or Omissions of Material Fact

A material misrepresentation is found where a defendant "either made a false statement of material fact or failed to make a statement of material fact thereby rendering the statements which were in fact made misleading." *Searls*, 64 F.3d at 1065. A statement is material if it would be viewed by "a reasonable investor as significantly altering the total mix of available information." *In re Newell Rubbermaid Inc. Sec. Litig.*, No. 99 C 6853, 2000 WL 1705279, at *14 (N.D. Ill. Nov. 14, 2000) (citing *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231-32 (1988) and *Parnes* v. *Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1998)).

Plaintiffs' Complaint alleges three distinct categories of material misrepresentations: (1) statements made concerning product release schedules and sales and earnings projections, alleged to have been misleading because defendants knew that Midway would be unable to produce its game titles according to the schedules; (2) statements included in periodic reports filed with the SEC, alleged to have been misleading because defendants knew and/or recklessly disregarded that they understated Midway's reserves for price protection and returns in violation of GAAP;

15

and, (3) statements included in periodic reports filed with the SEC and other statements regarding Midway's CPDC's, alleged to have been misleading because defendants knew that the game titles for which the CPDC's were incurred were not viable, yet improperly delayed the writedown of its CPDC's in violation of GAAP.

As to the first category of statements, defendants contend that all of the allegedly false or misleading statements at issue either were immaterial "puffing" not actionable under § 10(b) or Rule 10b-5 or were forward-looking statements accompanied by meaningful cautionary language and thus protected from liability by the PSLRA's safe harbor provision. Defendants contend that the second and third categories of statements are also forward-looking statements protected by the safe harbor. In addition, defendants argue that plaintiffs' allegations regarding the second and third categories neither sufficiently allege a GAAP violation nor meet the specificity requirements of Rule 9(b). As to all of the allegedly false or misleading statements, defendants contend that plaintiffs' have failed to state with particularity facts giving rise to a strong inference of scienter as required by the PSLRA.

1. *Statements concerning product release schedules and sales and earnings projections*

Plaintiffs allege that the defendants made the following material misrepresentations concerning the state of Midway's product development efforts or then-existing portfolio of products:

April 30, 2002 Press Release

- Midway believes these products comprise the strongest home video game lineup in the Company's history and that these products will produce record home video game results in 2002. (Am. Compl. ¶ 63)

16

<u>April 30, 2002 Conference Call</u>

- Midway is well position[ed] to [ ] capitalize on this industry growth, with a broad portfolio of products for . . . all three next generation platforms and the Game Boy Advance. This portfolio includes market-proven franchises and brands together with exciting new products which we expect will develop into new franchises for the future. (*Id.* ¶ 66)

- There's a handful of titles that as we're getting closer and closer to their introduction, our level of excitement and confidence in their ability to be strong sellers has been going up. (*Id.* ¶ 68)

<u>July 2, 2002 Conference Call</u>

- [W]e expect every game we bring out for the remainder of the year will be a strong performer . . . . (*Id.* ¶ 76)

<u>July 31, 2002 Press Release</u>

- The Company believes these products comprise the strongest home video game lineup in Midway's history and that these products will produce record home video game revenues in 2002. (*Id.* ¶ 79)

<u>February 20, 2003 Press Release</u>

- The Company also expects the launch of MLB SlugFest 20-04 to be very successful as preliminary consumer and retailer interest in the follow-up to last year's top-performing PlayStation 2 baseball title is very strong. (*Id.* ¶ 97.)

Defendants contend that these statements are mere "puffing" -- general, optimistic statements that are not capable of being objectively verified -- and, thus, are not actionable under § 10(b) or Rule 10b-5. *See Eisenstadt* v. *Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997) ("mere sales puffery is not actionable under 10b-5.").

Plaintiffs first respond that the question of whether these statements constitute "puffing" is a question of materiality and is thus a factual matter not properly decided on a motion to dismiss. However, plaintiffs' argument ignores several appellate decisions affirming dismissal at

the pleadings stage because the allegedly false or misleading statements were immaterial as a matter of law. *See San Leandro Emergency Medical Group Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996); *Raab* v. *General Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993). In fact, in the case on which plaintiffs rely, *Shaw* v. *Digital Equipment Corp., et al.*, 82 F.3d 1194, 1217 (1st Cir. 1996), the court held that a number of "loosely optimistic statements" were "immaterial as a matter of law." *Id.* at 1217-18 (holding that statements such as that the defendant "should show progress, quarter over quarter, year over year" and that the defendant was "confident that it was pursuing the right strategy" were immaterial as a matter of law). Thus, the court may properly address the issue on a motion to dismiss.

Courts have held immaterial as a matter of law "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Shaw*, 82 F.3d at 1217; *see, e.g.*, *San Leandro*, 75 F.3d at 807, 811 (holding not actionable a statement that the company "expects . . . another year of strong growth in earnings per share"); *Raab*, 4 F.3d at 289 (similar, where alleged fraudulent statement was "[the company] is poised to carry growth well in the future"); *Hillson Partners Ltd. Partnership* v. *Adage, Inc.*, 42 F.3d 204, 213 (4th Cir. 1994) ("[The company] is on target toward achieving the most profitable year in its history."); *Sequel Capital LLC* v. *Rothman, et al.*, No. 03 C 0678, 2003 WL 22757758, at * 12 (N.D. Ill. Nov. 20, 2003) (statement that the company was "highly profitable" with "great prospects" and an "unparalleled management team"). Scrutiny of vaguely optimistic statements for immateriality as a matter of law is "especially robust" in cases involving a fraud-on-the-market theory of liability, such as this one, because the hypothetical "reasonable investor," by

reference to whom materiality is gauged, is "the market" itself. "It is the market, not any single investor, that determines the price of a publicly traded security." *Shaw*, 82 F.3d at 1218; *cf.* Frank H. Easterbrook & Daniel R. Fischel, *The Economic Structure of Corporate Law* 297 (1991) (explaining how unsophisticated investors "take a free ride on the information impounded by the market"). The market, as opposed to an individual investor, is not easily misled by the rosy forecasts commonly issued by corporate spokespersons:

> A claim that a fraud was perpetrated on the *market* can draw no sustenance from allegations that the defendants made overly-optimistic statements, if those statements are ones that any reasonable investor (*ergo*, the market) would easily recognize as nothing more than a kind of self-directed corporate puffery. The market is not so easily duped, even granted that individual investors sometimes are.

*Shaw*, 82 F.3d at 1218; *see also Raab*, 4 F.3d at 289-90 ("[T]he market price of a share is not inflated by vague statements predicting growth. . . . Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen." (citations omitted)).

The court finds defendants' allegedly fraudulent statements concerning the state of Midway's product development efforts and then-existing portfolio of products immaterial as a matter of law. No reasonable investor, much less "the market" itself, would rely on such general statements of optimism. Even so bold a prediction as "Midway believes these products comprise the strongest home video game lineup in the Company's history and that these products will produce record home video game results in 2002" is "so lacking in specificity, . . . so clearly constituting the opinion[] of the speaker, that no reasonable investor could find [it] important to the total mix of information available." *Shaw*, 82 F.3d at 1217; *see Hillson*, 42 F.3d at 213

(holding immaterial the statement that the company "is on target toward achieving the most profitable year in its history.")

Plaintiffs' attempt to distinguish the statements here from the type of statements dismissed as "puffing" by other courts is unconvincing. Plaintiffs do not specifically compare *any* of the statements made by defendants to those dismissed by other courts. Nor do the cases they cite support their claims. For example, in *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319 (D. Mass. 2002), the court held that defendants' statement that a software program was "faster than ever before" was more than mere puffing. *Id.* at 332. That statement, unlike the statements at issue here, was objectively verifiable at the time it was made. Thus, the court found it material. The *Allaire* court did, however, hold that many of the statements alleged to be false were immaterial puffing. *See id.* at 331 (statement that the product "exceeded our expectations"), 332 (statement that the product was a "comprehensive software program that allows customers to rapidly build, deploy, and manage Web applications"), 332-33 (statement that the product would "speed development by providing packaged functionality based on industry best practices"). Thus, the court dismisses all claims alleged in the Complaint that are based on the statements cited above.

Many of the remaining statements plaintiffs allege are false and misleading are forward-looking statements that defendants contend are protected by the PSLRA's safe harbor. Allegedly false or misleading forward-looking statements by defendants include the product release schedules (Am. Compl. ¶ 60, 64, 80, 87) and statements regarding projected sales and earnings. (*See, e.g.*, Am. Compl ¶ 59 ("For the quarter ending March 31, 2002, Midway expects to ship six new home video game products and anticipates net sales of $33 million to $36 million."); *Id.*

20

¶ 66 ("We project video game software sales will grow between 20% and 30% in 2002."); *Id.*

¶ 88 ("We expect revenue for the December quarter will grow to $105 to $155 million, or 140

percent to 250 percent higher than last year.").) Defendants specifically identified such

statements as forward-looking by including language such as this from the December 11, 2001

registration statement:

> [Forward-looking] statements may be found throughout this prospectus. . . . Forward-
> looking statements typically are identified by the use of such terms as "may," "will,"
> "should," "expect," "anticipate," "believe," "estimate," "intend," and similar words,
> although some forward-looking statements are expressed differently.

(Def. Ex. 1, at 15.) Similar language is included in all other documents at issue.

Plaintiffs do not dispute that defendants' statements regarding product release schedules

or projected sales and earnings are forward-looking. Rather, they contend that Midway's

cautionary statements are insufficient to trigger the PSLRA's safe harbor because the statements

consist of "boilerplate language that is merely generic, and which broadly asserts that there is a

risk of failure for each of the Company's endeavors." (Pl. Resp., at 23.) Plaintiffs are correct

that "generic," "boilerplate" language is insufficient to trigger the safe harbor. To insulate a

defendant from liability under the safe harbor, cautionary language must be "sufficiently related

in subject matter and strong in tone to counter the statement made." *In re Boston Tech. Inc. Sec.*

*Lit.*, 8 F. Supp. 2d 43, 53 (D. Mass. 1998).

However, plaintiffs fail to address any of defendants' cautionary statements. Far from

being generic or boilerplate, defendants' cautionary statements are highly specific. For example,

Midway's Registration Statement warned, "We have experienced recent operating and net losses,

and we anticipate future losses. . . . We do not know when or whether we will become profitable

again." (*See, e.g.*, Def. Ex. 1, at 5.) Defendants then went on to describe numerous factors that could cause future operating results to be unfavorable, including:

> We depend on market acceptance of new products. . . . Videogame products typically have market life spans of only three to 12 months. Our new products may not achieve and sustain market acceptance during the short life cycle sufficient to generate revenue to recover our investment. . . . If our new products fail to gain market acceptance, our operating results and financial condition would be adversely affected.
> . . .
> Our market is subject to rapid technological changes. . . . When we chose to incorporate a new technology in our products or to publish or develop a product for a new platform, we may make a substantial investment one or two years in advance of initial shipment of these products. We may not be able to identify accurately which emerging technologies will gain widespread acceptance. If we invest in the development of a videogame incorporating a new technology or for a new platform that does not achieve significant commercial success, our revenues from that product will be adversely affected.
> . . .
> We have experienced and continue to experience significant quarterly fluctuations in net sales and other operating results due to a variety of factors, including:
> - variations in the level of market acceptance of our products;
> - delays and timing of product introductions;
> . . .
> - development and promotional expenses relating to the introduction of our products.

(*Id.*, "Risk Factors") Such highly specific cautionary statements continue for pages. Midway expressly incorporated these cautionary statements in its press releases, in its quarterly Form 10-Q's, and in conference calls with analysts.[6] Cautionary statements in SEC filings incorporated

---

[6]For example, Midway's December 19, 2001 press release states

This press release contains forward-looking statements concerning the use of net proceeds from the public offering, future business conditions on the outlook for Midway . . . based on currently available information that involves risks and uncertainties. The Company's actual results could differ materially from those anticipated in the forward-looking statements as a result of these risks and uncertainties, including, without limitation, the financial strength of the videogame industry, dependence on new product introductions and the ability to maintain the scheduling of such introductions, technological changes, dependence on major platform manufacturers and *other risks more fully described under "Risk Factors" in the Company's registration statement on Form S-3 filed with the Securities and Exchange Commission on December 11, 2001.*

(Def. Ex. 2, emphasis added.) The remaining statements cited in the Complaint all expressly incorporate by

(continued...)

by reference are adequate to invoke the PSLRA's safe harbor. *See, e.g., Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 844, 846 & n. 9 (N.D. Ill. 2003); *In re Champion Enters., Inc.*, 144 F. Supp. 2d 848, 859 (E.D. Mich. 2001).

Similarly, statements regarding anticipated product release dates were accompanied by cautionary language identifying factors that could cause actual results to differ from Midway's projections. Midway's Registration Statement stated

> We may experience delays in introducing new products.
> From time to time, we have experienced delays in product introductions. The timing of a creative process is difficult to predict. Unanticipated delays could cause us to miss an important selling season. A delay in introducing products could also affect our development schedule for other products. In either case, we may not achieve our anticipated revenues.

(Def. Ex. 1.) Again, Midway expressly incorporated these cautionary statements in its press releases, in its quarterly Form 10-Q's, and in conference calls with analysts.

Numerous decisions in this district and elsewhere have dismissed Rule 10b-5 claims based on similar – and often less specific – cautionary language. *See Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 954 (N.D. Ill. 2003)(statement that "[f]actors that might cause such a difference [in financial results] include but are not limited to risks associated with introducing new products, entering new markets, availability of resources, competitive response, and economic conditions in the telecommunications industry" held to be sufficient to trigger the safe harbor); *Stavros*, 266 F. Supp. 2d at 843-46 ("exhaustive" list of risk factors sufficient to trigger safe harbor); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 242-43 (3d Cir.

---

[6](...continued)
reference the cautionary language contained in the Registration Statement, Midway's Transition Period 10-K, or Midway's 10-K for 2002. (*See* Def. Exs. 3, 4, 6-20, 22-26.)

2004)(statements suggesting "lack of certainty or confidence" in company's predictions sufficient to trigger safe harbor). Thus, the court finds that Midway's statements regarding product release dates and projected future earnings are protected by PSLRA's safe harbor.

Plaintiffs' contention that defendants are liable for false or misleading statements despite the safe harbor because defendants knew that particular forward-looking statements were false when made is without merit. For purposes of § 78u-5(c)(1)(A), proof of knowledge of the falsity of a forward-looking statement is "irrelevant" when the statement is accompanied by meaningful cautionary language. *Miller* v. *Champion Enterprises Inc.*, 356 F.3d 660, 687 (6th Cir. 2003); *Harris* v. *Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999) ("If a statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant."); *Sandmire* v. *Alliant Energy Corp.*, 296 F. Supp. 2d 950, 958 (W.D. Wis. 2003) ("Such knowledge and the state of mind of the defendants at the time the statement was made are irrelevant to a safe harbor defense based on cautionary language."); *see also* H.R. Conf. Rep. 104-369, at 44 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.").

2. *Statements concerning reserves for price protection, returns, and discounts*

Plaintiffs allege that each of Midway's financial statements in periodic reports filed with the SEC on Forms 10-Q and 10-K during the class period materially misstated Midway's operating results by manipulating reserves for price protections, returns, and discounts in

violation of GAAP.[7] (Am. Compl. ¶ 61(d), 70-71, 82-83, 90-91, 97-98, 123-127.) Specifically, plaintiffs allege that Midway's financial statements violated Statement of Financial Accounting Standards ("FAS") No. 48, regarding revenue recognition when a right of return exists, and FAS No. 5, regarding accounting for contingencies. FAS No. 48 states that when revenue is recognized, any costs or losses that may be expected in connection with any returns shall be accrued in accordance with FAS No. 5. (Am. Compl. ¶ 127, *citing* FAS No. 48, at ¶ 7.) FAS No. 5 provides that an estimated loss from a loss contingency "shall be accrued by a charge to income" if (1) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (2) the amount of the loss can be reasonably estimated. (*Id.*, *quoting* FAS No. 5, at ¶ 8.) FAS No. 5 also requires that financial statements disclose contingencies when it is at least reasonably possible that a loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, the range of loss, or state that such an estimate cannot be made. (*Id.*)

Defendants first argue that Midway's financial reports were based on projections of future returns, not historical facts, and therefore were forward-looking statements protected by the safe harbor. This argument is without merit. Midway's financial reports were included in SEC

---

[7]GAAP, are "a series of general principles followed by accountants." *United States* v. *Basin Elec. Power Coop.*, 248 F.3d 781, 786 (8th Cir. 2001). More specifically, GAAP "are the official standards adopted by the American Institute of Certified Public Accountants (the 'AICPA'), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the 'APB'), and the Financial Accounting Standards Board (the 'FASB')."*Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 160 n. 4 (2d Cir. 2000). "There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question."*Shalala* v. *Guernsey Mem'l Hosp.*, 514 U.S. 87 (1995). The sources for GAAP include official publications consisting of APB opinions, FASB Statements and Accounting Research Bulletins (ARB). "Included in GAAP are the Financial Accounting Standards ('FAS') published by the [FASB]." *Basin Elec.*, 248 F.3d at 786.

filings prepared in accordance with GAAP and thus excluded from the safe harbor. 15 U.S.C.
§ 78u-5(b)(2)(A).

Defendants' second argument is more persuasive. Defendants argue that plaintiffs
allegations regarding Midway's reserves are insufficient under the heightened pleading standards
of Rule 9(b). The only facts plaintiffs provide to support the general allegation that Midway
manipulated its reserves appear in the statements of W-5, who stated that Midway's "reserves for
sales returns were out of whack," that the process of computing reserves was comparable to
"throwing a dart at a board," that Midway's management purposely understated sales return
reserves so that the company could overstate its projections and sales revenues, and that Midway
"established a reserve at 2% of sales to fund [in-store promotions of Midway's products], but the
Company spent much more." (*Id.* ¶ 43-45.)

"A general allegation that the [accounting] practices at issue resulted in a false report of
company earnings is not a sufficiently particular claim of misrepresentation [to satisfy Rule
9(b)]." *Gross* v. *Summa Four, Inc.*, 93 F.3d 987, 996 (1st Cir. 1996). Rather, plaintiffs must
allege the amount of the putative overstatement of revenues or the net effect it had on the
company's earnings. *See id.*; *Roots Partnership* v. *Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th
Cir. 1992) (allegation that company "failed to establish adequate reserves for its excessive and
outdated inventory" does not satisfy Rule 9(b) where investor does not allege "what the
company's reserves were or suggest how great the reserves should have been"); *Shushany* v.
*Allwaste, Inc.*, 992 F.2d 517, 522 (5th Cir. 1993) (allegation that the company had improperly
adjusted the accounting of its inventory to inflate revenues and earnings does not sufficiently
plead fraud where complaint does not explain, *inter alia*, how the adjustments affected the

company's financial statements and whether they were material in light of the company's overall financial position); *cf. Cohen* v. *Koenig,* 25 F.3d 1168, 1173 (2d Cir.1994) (fraud pleaded with sufficient particularity by setting out representations made, what financial figures they were given, and what they alleged to be the true financial figures). Plaintiffs have alleged neither the amount of the alleged overstatement of revenues due to defendants reserve accounting or the net effect it had on the company's earnings. In fact, they have pled no specific facts that would show that defendants reserve estimates were so unreasonable when they were made that they constituted fraud.

Plaintiffs allege that they should not be required to plead such specifics "when other allegations support and corroborate the existence of accounting improprieties." (Resp., at 11, citing *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 343 (S.D.N.Y. 2004) and *In re Cabletron Sys. Inc.*, 311 F.3d 11 (1st Cir. 2002).) Even if this were so, plaintiffs do not cite to a single "other allegation" that supports and corroborates the existence of accounting improprieties. W-5's statements simply reiterate plaintiffs' general allegation that defendants manipulated Midway's reserves, without providing any specific information. (*See* Am. Compl. ¶ 44: "Midway was kind of throwing out any kind of number out there to get the kind of [revenue] number they wanted it to be . . . .") "'Because only a fraction of financial deteriorations reflects fraud,' . . . plaintiffs in securities cases must provide enough information about the underlying facts to distinguish their claims from those of disgruntled investors." *Arazie* v. *Mullane*, 2 F.3d 1456, 1458 (7th Cir. 1993) (quoting in part *DiLeo*, 901 F.2d at 628). Thus, plaintiffs allegations regarding the manipulation of reserves fail under Rule 9(b).

### 3. *Statements concerning CPDC's*

Plaintiffs allege that each of Midway's financial statements in periodic reports filed with the SEC on Forms 10-Q and 10-K during the class period materially misstated Midway's operating results by failing to timely write-down CPDC's for game titles defendants knew were not viable. (Am. Compl. ¶ 51-52, 100-105, 128-131.) Specifically, plaintiffs allege that defendants "should have written off more than $20 million in CPDC's by early 2003, but told investors that the games were still viable, keeping the CPDC's off Midway's income statement." (Pl. Resp., at 7-8.) As a result, Midway's financial statements allegedly violated Statement of Financial Accounting Concepts ("FASCON") No. 5, regarding recognition and measurement in financial statements, and FAS No. 86, regarding accounting for the costs of computer software to be sold. FASCON No. 5 states, "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated . . . ." FAS No. 86 provides the following guidance for evaluating capitalized software costs:

> At each balance sheet date, the unamortized capitalized costs of a computer software product shall be compared to the net realizable value of that product. The amount by which the unamortized capitalized costs of a computer software product exceed the net realizable value of that asset shall be written off. The net realizable value is the estimated future gross revenues from that product reduced by the estimated future costs of completing and disposing of that product . . . . The reduced amount of capitalized computer software costs that have been written down to net realizable value at the close of an annual fiscal period shall be considered to be the cost for subsequent accounting purposes . . . .

Plaintiffs also allege that Nicastro's statement during the April 29, 2003 conference call stating that no write-down of CPDC's would occur was materially false and misleading because he knew that the future economic benefits of certain games would not offset the capitalized costs. (Am. Compl. ¶ 105.)

Again, Defendants first argue that statements based on accounting for CPDC's are forward-looking statements protected by the safe harbor. This is true for Nicastro's statement that no CPDC write-down would occur. Nicastro said, "So, right now what's on the balance sheet reflects products that we believe strongly in, and feel have commercial viability. So, we don't see anything forthcoming at this time." (Am. Compl. ¶ 103.) This is clearly a forward-looking statement. At the beginning of the conference call, Midway expressly stated that "actual results could differ from those anticipated in the forward-looking statements." (Def. Ex. 23, at 1.) The conference call also referred participants to the cautionary language contained in Midway's Form 10-K. (*Id.*) This language warned that

> . . . Midway evaluates the recoverability of capitalized software development costs on a product-by-product basis. A charge is recorded when management's forecast for a particular game indicates that the unamortized capitalized costs exceed the net realizable value of that asset. The net realizable value is the estimated future gross revenue from that game reduced by the estimated future cost of completing and selling that game. As a result, the forecasted sales for a given game are a sensitive factor in this calculation. If revised forecast game sales are less than management's current forecast it is possible the Company could record charges to write-down software development costs previously capitalized.

(Def. Ex. 21, at 29.) This language is sufficiently specific to trigger the safe harbor for oral forward-looking statements. 15 U.S.C. § 78u-5(c)(1)(A) & (c)(2). However, Midway's financial reports were included in SEC filings prepared in accordance with GAAP and thus excluded from the safe harbor. 15 U.S.C. § 78u-5(b)(2)(A).

Nevertheless, the remainder of plaintiffs CPDC claims fail to satisfy the pleading requirements of Rule 9(b). Plaintiffs allege only that Midway's SEC filings were fraudulent because Midway should have written off more than $20 million in CPDC's "by early 2003." It is impossible to tell from the Complaint whether plaintiffs are suggesting that CPDC's were not

misstated prior to "early 2003" or whether they are alleging that the misstatements began at some point prior to early 2003 and increased until the CPDC's became $20 million in early 2003. Furthermore, plaintiffs provide no facts explaining the basis for the allegation that plaintiffs "should have written off more than $20 million in CPDC's" at any time. They do not refer to any specific game titles that defendants knew were not viable when Midway issued its financial statements.[8] Nor do they allege how much of the CPDC's should have been written off. In fact, Midway did write-down CPDC's during the class period, including $9 million in March 2003. Plaintiffs claim that these write-downs were "inadequate," without explaining how much Midway should have written down and when. Instead, they again simply refer to the company's "inability to produce its game titles in a timely manner." This is clearly insufficient under Rule 9(b).

Additionally, all that plaintiffs allege is that defendants failed to "timely" write-down CPDC's. The Seventh Circuit has held that such timing issues, without more, cannot give rise to a securities fraud claim. For example, in *DiLeo*, 901 F.2d at 626, plaintiffs' securities fraud claim alleged that certain bank loans should have been written off because they were likely uncollectible. The court held

> For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner. If all that is involved is the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence.

*Id.*; *see also Grassi* v. *Information Resources, Inc.*, 63 F.3d 596, 600 (7th Cir. 1995) ("Plaintiffs essentially claim that [defendant] should have written off its bad investment sooner–but that is

---

[8]In fact, Midway ultimately cancelled only two games for which CPDC's were being accrued. (Def. Ex. 26.)

not fraud."); *Johnson* v. *Tellabs, Inc.*, 262 F. Supp. 2d 937, 950 (N.D. Ill. 2003) ("A plaintiff must allege more than delinquent write-offs. Instead, a complaint must specifically state how the delinquent write-offs somehow went beyond bad business decision or negligence, and instead actually constituted fraud."). Accordingly, plaintiffs' CPDC allegations do not state a claim for fraud.

## B. Count II - "Controlling Person" Liability

Where a plaintiff fails to state a claim against the "controlled person," the claim against the controlling person fails as well. *See FMC Corp.* v. *Boesky*, 727 F. Supp. 1182, 1199 n. 19 (N.D. Ill. 1989). Plaintiffs have failed to state a claim against Midway. Accordingly, their controlling person claims against the individual defendants are dismissed.

## CONCLUSION

For the reasons stated above, defendants' Motion to Dismiss [#22] is granted. Case is terminated.

ENTER:

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: August 27, 2004